Stephen C. **VAN ZANDT** and **Freedom From Religion Foundation, Inc.**, a Wisconsin Not-For-Profit Corporation, Plaintiffs,

v.

James R. **THOMPSON**, Governor of the State of Illinois, Michael Madigan, Speaker of Illinois House of Representatives, Lee Daniels, Minority Leader, Illinois House of Representatives, Mal Hildebrand, Bruce Farley, John Davidson and Roger Keats, Senators of the Illinois Senate, All Individually and In Their Official Capacity In Their Respective Offices, Jim Edgar, In His Official Capacity as Custodian of the Illinois State Capitol Building, James H. Donnewald, In His Official Capacity as Treasurer of the State of Illinois and Roland W. Burris, In His Official Capacity as Comptroller of the State of Illinois, Defendants.

No. 86 C 0894.

United States District Court,
N.D. Illinois, E.D.

Dec. 4, 1986.

Donald S. Rothschild, Elmer Gertz, Oak Park, Ill., for plaintiffs.

Office of the Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In May 1985, Michael Madigan, Speaker of the Illinois House of Representatives, introduced in the Illinois House enabling legislation designated as House Resolution No. 408 ("HR 408") which authorized and made plans for the conversion of a hearing room in the Illinois State Capitol Building ("the Capitol") into a prayer room. Shortly thereafter, HR 408 was adopted by the full House and referred to the Legislative Space Needs Commission to "make available a room with facilities for prayer and meditation, primarily for the use of the members of the General Assembly."[1] On

1. House Resolution No. 408 states in full:

WHEREAS, Abraham Lincoln immortalized the phrase "this nation under God" in the Gettysburg Address, and in the Pledge of Allegiance to the Flag, which is recited at the opening of each Session of the General Assembly, we utter "one nation under God"; and

WHEREAS, Prayer was offered at the great Convention which framed our National Constitution. [This is historically inaccurate as a matter of record. See Marsh v. Chambers, 463 U.S. 783, 787, 103 S.Ct. 3330, 3334, 77 L.Ed.2d 1019 (1983)] and our currency and many of our postage stamps witness our faith in Divine Providence, and a long list of National and Illinois leaders down through the years have borne witness to their personal trust in God; and

WHEREAS, Near the Rotunda of the United States Capitol there it [sic] a room set apart for prayer and meditation to be used primarily by members of Congress who wish to withdraw and seek Divine strength and guidance, both in public affairs and in their own personal concerns; and

WHEREAS, The prayer room was established pursuant to House Concurrent Resolution 60, in 1953, and Senate Concurrent Resolution 14, in 1954 during the Eighty-Third Congress of the United States; and

WHEREAS, The Honorable Joseph W. Martin Jr., Speaker of the United States House of Representatives, made available an appropriate room on the House side of the Capitol which was completed and opened for use in March of 1955; and

WHEREAS, More than 20 years ago members of the Illinois General Assembly initiated efforts to establish a place within the Illinois State Capitol Building for prayer and meditation, but their efforts were temporarily thwarted; and

WHEREAS, The strong desire remained alive within the hearts of many members of the Illinois General Assembly, and those members have maintained and established a spiritual

February 6, 1986, plaintiffs Stephen C. Van Zandt and the Freedom From Religion Foundation, Inc. ("the Foundation") filed this suit for declaratory and injunctive relief under 42 U.S.C. § 1983 (1982) against Madigan and other Illinois officials [2] challenging the constitutionality of the enactment and execution of HR 408. The parties have stipulated to a short factual record and agreed to seek a resolution of this dispute through cross motions for summary judgment. Because we find that state authorization and establishment of a Capitol prayer room extends beyond the boundaries of permissible government conduct in support of religion under the First Amendment Establishment Clause, this Court grants the plaintiffs' motion for summary judgment and denies that of the defendants.

## I. STANDING

Although not raised by the parties in their briefs, the threshold issue which must be preliminarily addressed is the plaintiffs' standing to bring this suit. Standing under the First Amendment Establishment Clause is often a tricky issue because of the somewhat haphazard manner in which the doctrine in this area has been laid out. Van Zandt is an Illinois resident and tax-

---

bond among themselves, regardless of philosophical, political or religious differences; and

WHEREAS, Many of the same individuals currently meet together for Bible study and prayer breakfast to improve the relationships among members of the General Assembly, and some as recently as 2 years ago sought general approval from the Legislative Space Needs Commission; and received general approval from the leaders of the General Assembly, creating a fire of enthusiasm that died down slightly, only to be rekindled in the past several months; and

WHEREAS, The Preamble to the Constitution of the State of Illinois reads "We the People of the State of Illinois—grateful to the Almighty God for the civil, political and religious liberty which He has permitted us to enjoy and seeking His blessing upon our endeavors," sets the stage for such a room; and

WHEREAS, The establishment of such a room, because of its universality, is within the provisions of Section 3 of Article X of the Illinois State Constitution, where the use of public funds for sectarian purposes is forbidden in that no State funds shall be allocated for "anything in aid of any church or sectarian purpose"; and

WHEREAS, The concept is consistent with the provisions of subsection (a) of Section 1 of Article VIII of the Illinois State Constitution, which provides that "public funds or credit shall be used only for public purpose" in that the facility will be made available to the People of the State of Illinois, represented in the General Assembly, and it is the intent that private donations shall ultimately finance the cost of any renovation necessary to establish a proper and suitable room; and

WHEREAS, The Illinois House and Senate as well as the United States House and Senate open all their Sessions with prayer through the Ministry of Chaplains, and such Chaplains pray to God for the men in our armed services for daily strength, will and life; and

WHEREAS, It is in this great tradition that the General Assembly should have, primarily for its members in the State Capitol Building, a quiet and special place, where its members may seek God, the comfort of His presence, the light of His guidance, and the strength of His love; therefore be it

RESOLVED, BY THE HOUSE OF REPRESENTATIVES OF THE EIGHTY–FOURTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, that the Legislative Space Needs Commission is hereby authorized and directed to make available a room with facilities for prayer and meditation, primarily for the use of the members of the General Assembly, and the Commission shall arrange for the maintenance of the prayer room; and be it further

RESOLVED, That the Speaker of the House in conjunction with the House Minority Leader, shall appoint a special committee to arrange for the design and equipment of the prayer room and for the raising of private donations to fund the operation and maintenance of the prayer room; and be it further

RESOLVED, That a suitable copy of this Resolution be presented to the Executive Director of the Legislative Space Needs Commission.

2. The defendants are James R. Thompson, Governor of the State of Illinois, Michael Madigan, Speaker of the Illinois House of Representatives, Lee Daniels, Minority Leader of the Illinois House of Representatives, Mal Hildebrand, Bruce Farley, John Davidson and Roger Keats, Senators of the Illinois Senate, all individually and in their respective official capacities, Jim Edgar, in his official capacity as Custodian of the Illinois State Capitol Building, James H. Donnewald, in his official capacity as Treasurer of the State of Illinois and Roland W. Burris, in his official capacity as Comptroller of the State of Illinois. They will be referred to collectively in the body of this opinion as the defendants. Hildebrand, Farley, Davidson and Keats are also members of the Legislative Space Needs Commission.

payer who is also a member of the Foundation. The Foundation is a Wisconsin not-for-profit corporation designed as an educational organization for people who are "concerned with upholding the principles of the First Amendment of the United States Constitution." Complaint ¶ 4. It has members who reside throughout the United States including Illinois. The allegations in the complaint lead this Court to the conclusion that Van Zandt is essentially asserting standing as an Illinois taxpayer and the Foundation's standing is premised on injury to its members who are Illinois taxpayers.

From the doctrinal development of standing in Establishment Clause cases, we can derive two basic principles. First, an individual may not maintain standing merely because he or she is offended, no matter how strongly, by the actions of the state. *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 485–87, 102 S.Ct. 752, 765–66, 70 L.Ed.2d 700 (1982); *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 268 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986). Nonetheless, if a plaintiff alters his or her conduct in any manner as a direct consequence of the government's alleged Establishment Clause violation, a sort of behavioral manifestation of the deep offense which will otherwise not suffice for standing, he or she has proper standing to sue. *St. Charles,* 794 F.2d at 268; *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1102–09 (11th Cir.1983). However, Van Zandt has alleged neither injury to his sensibilities nor any change in his behavior resulting from the proposed prayer room.

Van Zandt has charged, however, that he is an Illinois taxpayer whose funds will ultimately be absorbed in some manner by the establishment of the prayer room. Taxpayer standing is the most frequent basis asserted by individuals challenging government conduct which allegedly clashes with the restrictions of the First Amendment. *See, e.g., Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). The concept of taxpayer standing differs somewhat when the taxpayer is asserting a state violation of the Establishment Clause rather than a federal violation. In the latter case, standing is premised on the plaintiff's challenge to Congress' authority to make arguably religion-supportive expenditures which exceed its powers under the taxing and spending clause of the Constitution, U.S. Const. art. I, § 8. *Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 1954, 20 L.Ed.2d 947 (1968).

In the case of state government spending, however, there appears to be less of a formal guideline for the assertion of taxpayer standing. In *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court affirmed the appellate court finding that a Nebraska state legislator had standing to sue the state in challenging the conducting of non-denominational prayer at the beginning of each legislative session. The Court wrote that "we agree that Chambers, as a member of the legislature *and as a taxpayer whose taxes are used to fund the chaplaincy, has standing* to assert this claim." *Id.* at 786 n. 4, 103 S.Ct. at 3333 n. 4 (1983) (emphasis added). Although the Court did not specify which of the two bases for standing it relied on, it is our view that either would be independently sufficient to support standing. *Cf. Doremus v. Board of Education,* 342 U.S. 429, 433–34, 72 S.Ct. 394, 396–97, 96 L.Ed. 475 (1952) (complaint against government supported religious activity not sufficient to maintain plaintiffs' standing absent allegations of taxpayer injury). Despite the fact that HR 408 includes a vague provision for the solicitation of private funding for the remodeling of the prayer room, state expenditures inevitably will be necessary in conjunction with general maintenance attendant to the overall care of the Capitol, with the administration and oversight of the creation of the prayer room by publicly-salaried members of the legislature and the Legislative

588

Space Needs Commission [3] and through the loss of the use of an additional hearing room on public property for the Illinois House of Representatives. *See Stone v. Graham,* 449 U.S. 39, 42 & n. 4, 101 S.Ct. 192, 194 & n. 4, 66 L.Ed.2d 199 (1980). Accordingly, we find that Van Zandt has proper standing to raise this challenge to the constitutionality of HR 408.[4] We now turn to the merits of the plaintiffs' claims.

## II. THE ESTABLISHMENT CLAUSE [5]

Although plaintiffs raise challenges under both the Illinois and United States Constitutions, we first assess HR 408's compatibility with the provisions of the latter since any analysis of whether the law violates Section 3 of Article I of the Illinois Constitution necessarily begins with an inquiry regarding the law's validity under the Establishment Clause. *See People ex rel. Klinger v. Howlett,* 56 Ill.2d 1, 3–4, 305 N.E.2d 129, 130 (1973) (holding that analysis of constitutionality of state-supported religious activity under Illinois and United States Constitutions is coextensive). The First Amendment to the Constitution requires that "Congress shall make no law respecting the establishment of religion." U.S. Const. amend I. This restriction has long been held to apply as well to the conduct of state and local governments through the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), and the

Supreme Court has continually reaffirmed this basic constitutional principle. *Wallace v. Jaffree,* 472 U.S. 38, 48–55, 105 S.Ct. 2479, 2486–89, 86 L.Ed.2d 29 (1985).

Since 1971 the Supreme Court has relied almost exclusively on a three-part test for evaluating the constitutional validity of legislative enactments which arguably offend the provisions of the Establishment Clause. That test, articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), demands that courts look to the following. First, the challenged statute must have a secular legislative purpose. Second, the principal or primary effect of the legislation must neither advance nor inhibit religion. Finally, the statute must not foster an excessive entanglement between the state and religion. *Id.* at 612–13, 91 S.Ct. at 2111. If the legislation or other government action fails to meet even one of these three threshold inquiries, it is constitutionally invalid. *See Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982). In recent years, individual Supreme Court Justices have dabbled at different approaches to the Establishment Clause analysis resulting in a rather muddled doctrinal path for lower courts to follow. The most striking departure from the *Lemon* test occurred in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), where the

3. The Legislative Space Needs Commission was created by statute by the Illinois legislature to, among other things, "make space allocations in facilities provided for the use of the General Assembly and its related agencies." Ill.Rev.Stat. ch. 63, ¶¶ 222, 223, 223.05 (1985).

4. Furthermore, it is apparent that under the principles recently reaffirmed by the Supreme Court in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* —— U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Foundation has associational standing as a representative of its members who are Illinois taxpayers. The Court in *Brock* held that an organization could maintain representative standing if (1) its members would otherwise have standing on their own; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief

requested requires participation of the individual members. *Id.* at ——, 106 S.Ct. at 2529. All three of these conditions are met by the Foundation in the present case.

5. Summary judgment is appropriate only where the moving party shows that no genuine issue of material fact exists and that it is accordingly entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). The facts in the present action are essentially undisputed and the parties seek resolution only of the constitutionality of HR 408. The factual record includes a copy of HR 408, the affidavit of defendant Mal Hildebrand, Executive Director of the Legislative Space Needs Commission and an Illinois State Senator, and a copy of certain minutes of the Commission regarding the prayer room.

majority opinion, against a vigorous dissent, failed to even apply *Lemon* to the challenged government conduct. In *Marsh,* the Court upheld the Nebraska legislature's practice of opening each day's legislative session with a non-denominational prayer offered by a state-employed chaplain. As discussed in further detail below, the *Marsh* Court abandoned the *Lemon* test in favor of an approach relying on the unique and extensive history of legislative prayer both in Congress and in the halls of the nation's state legislatures. Nonetheless, in Establishment Clause cases decided since *Marsh,* the Court has returned to the *Lemon* test in evaluating the constitutionality of state and municipal conduct respecting the establishment of religion. *See Witters v. Washington Department of Services for the Blind,* — U.S. —, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986); *Wallace v. Jaffree,* 472 U.S. 38, 55–56, 105 S.Ct. 2479, 2489–90, 86 L.Ed.2d 29 (1985); *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984).[6] Although it is our view that the Court's great reluctance to abandon the *Lemon* test mandates our application of that analysis in this case, *see American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 270 (7th Cir.) (citing *Lemon* as the Supreme Court standard in Establishment Clause cases), *cert. denied,* — U.S. —, 107 S.Ct. 458, 93 L.Ed.2d 403 (U.S.1986), we also undertake an analysis of plaintiffs' challenge to HR 408 in terms of the historical approach used in *Marsh.* Our finding is that under either approach HR 408's establishment of a prayer room is offensive to both the language and fundamental meaning of the First Amendment Establishment Clause.

## A. The *Lemon* Analysis

As stated above, if any one of the purpose, effect or entanglement elements of

the *Lemon* test is violated, the state law must be struck down. *See Larkin,* 459 U.S. at 123, 103 S.Ct. at 510. In creating the now familiar three-part test, the Court was not simply constructing a "technical" test which would be easy to apply as the defendants have argued, but instead was attempting to synthesize the "cumulative criteria developed by the Court over many years," 403 U.S. at 612, 91 S.Ct. at 2111, into a useful analytical framework.

■ The first step of the constitutional inquiry is whether the legislative enactment has a secular legislative purpose. The relevant question in this regard is "whether government's actual purpose is to endorse or disapprove of religion." *Wallace,* 472 U.S. at 56, 105 S.Ct. at 2490 (*citing Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)). Furthermore, the Supreme Court has found state statutes in violation of the Establishment Clause even where there is a purported secular purpose if the preeminent purpose of the state's action is religious in nature and the secular rationale offered by the government is merely "self-serving." *Stone v. Graham,* 449 U.S. 39, 41–42, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980). Stated differently, the secular purpose requirement "is not satisfied ... by the mere existence of *some* secular purpose, however dominated by religious purposes" *Lynch,* 465 U.S. at 691, 104 S.Ct. 1368 (O'Connor, J., concurring) (emphasis added).

HR 408 ostensibly sets aside a room for members of the General Assembly (and apparently members of the general public as well) for either prayer *or* meditation. Defendants argue that this language indicates that the resolution was passed with the intent to provide space where individu-

---

**6.** In *Lynch,* the majority acknowledged that the Court has often found it useful to apply the three part analysis from *Lemon,* but that the Court has been unwilling to confine itself to a "single test or criterion in this sensitive area." 465 U.S. at 679, 104 S.Ct. at 1362. Justice O'Connor, in a concurring opinion, acknowledged the past use of the *Lemon* test but delved

into a detailed approach which "clarifies the *Lemon* test as an analytical device." *Id.* at 687–94, 104 S.Ct. at 1366–70 (O'Connor, J., concurring). The four dissenting justices chose to reaffirm their faith in looking to the "settled test" announced in *Lemon* as a guiding principle. *Id.* at 694–727, 104 S.Ct. at 1370–86 (Brennan, J., dissenting).

als, and particularly legislators, can go "to reflect and collect their thoughts" and that "[t]he provision of a space where legislators can reflect and think in peace and quiet without interruption clearly serves a legitimate secular purpose." Memorandum in Support of Defendants' Motion for Summary Judgment at 11 ("Defendants' Memo"). The defendants have offered no legislative history to support this asserted secular purpose and no such purpose can be gleaned from the language of the resolution itself. Indeed, aside from two gratuitous references to "meditation," HR 408 demonstrates its clear religious purpose with unequivocal statements such as the following: "It is in this great tradition that the General Assembly should have, primarily for its members in the State Capitol Building, *a quiet and special place, where its members may seek God, the comfort of His presence, the light of His guidance, and the strength of His love.*" HR 408 at 3 (emphasis added). The repeated, candid religious references in the body of the resolution, *supra* at n. 1, signal the legislature's abandonment of any pretentions of neutrality as between religion and non-religion. From the face of the statute, we can only conclude that the purpose of the legislature in passing HR 408 was to endorse a religious presence in the Capitol.

Defendants argue that even if HR 408 has no secular purpose, this Court cannot strike it down unless the government's action is *wholly* motivated by religious considerations. Defendants' Memo at 10. This rather tautological statement is taken out of context from *Lynch*, 465 U.S. at 680, 104 S.Ct. at 1362, where it was used to describe past cases and not a standard for future ones. Logically, the absence of any secular purpose must by definition mean that there is a religious motivation underlying the governmental action. Furthermore, although the presence of some religious purpose behind government action is not always constitutionally fatal, those cases upholding such action have generally been premised on a legitimate and clearly articulated secular purpose. *See Lynch,*

465 U.S. at 680, 104 S.Ct. at 1362, and cases cited therein.

In any event, HR 408 appears to have a preeminently, and perhaps wholly, religious purpose, and we accordingly find that it fails to meet the secular purpose criterion of *Lemon.* Moreover, although as a general rule courts should be reluctant to ascribe an unconstitutional motive to a governmental body, they may be less hesitant where the government's purported secular objectives could readily be accomplished by other means. *See Lynch,* 465 U.S. at 699, 104 S.Ct. at 1372 (Brennan, J., dissenting). In the present case, if the Illinois legislature's real purpose were to create a place where "individuals may go to reflect and collect their thoughts," a lounge for legislators perhaps, it could do so through enabling legislation unencumbered with the unequivocal religious language and purpose which invalidates HR 408.

■ The effect prong of *Lemon* instructs courts to ask "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). In enacting HR 408, the Illinois legislature has conveyed a message to the citizens of Illinois that it endorses prayer and the practice of particular religions in the Capitol. That message is particularly strong where the interests of the non-religious are so noticeably absent from the language of the resolution. Furthermore, prayer is an inherently religious act. Finally, the actual creation of a Capitol prayer room, aside from the enactment of the enabling legislation, would have the tendency and effect of promoting the practice of religion in the seat of the state government. Although it is premature at this stage to assess the impact the actual presence of the prayer room would have, it is unlikely that the presence of such a room in the Capitol could have any effect but to endorse religion.

■ Having found that HR 408 fails both the purpose and effect elements of *Lemon* we need not reach the question of

whether the resolution also fosters excessive entanglement between government and religious institutions. Indeed, at this point it may be premature to fully elaborate on the entanglement analysis given the limited record before us and the fact that the prayer room has not yet been created. Nevertheless, we express grave doubts as to whether the statute would ultimately survive the entanglement aspect of the *Lemon* inquiry either. The entanglement test is designed to ensure that the relationship between government and religion is not so close that the ties that bind the two do not promote government interference with the administration of religious activity or vice versa. Not only does the presence of a religious room in the seat of the state's government represent symbolic entanglement, but also the Legislative Space Needs Commission and legislators who are members thereof will be heavily involved in the administration and maintenance of the room.[7] Moreover, supplanting government funds with privately-raised donations does not automatically cure the constitutional defect. *See, e.g., Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980).[8]

Accordingly, because this Court finds that HR 408 is unable to pass the *Lemon* test, we find it incompatible with both the language and purpose of the First Amendment. In doing so, we do not doubt for a moment the sincere desires of the defendants to facilitate religious observance by members of the Illinois legislature, but find that these wishes must give way to the interests of all citizens protected by the First Amendment.

### B. The Swamp of *Marsh*

The Supreme Court's decision in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), created a particularly perplexing dilemma for lower courts undertaking Establishment Clause analyses in subsequent cases. The majority opinion's unexplained snubbing of a well-settled constitutional test almost unfailingly employed in such cases has caused some confusion among lower courts. Nonetheless, we view the resolution of this analytical conundrum as rather simple. In our view, *Marsh* is a decision wedded to the unique historical circumstances involved there, but not present in any other Establishment Clause challenge. Although this Court deems the *Lemon* test as the controlling analysis in the present case, we engage in a brief discussion of the historical approach in this case to demonstrate that *Marsh* has no bearing on the outcome of the present constitutional challenge to HR 408.

In *Marsh,* the Court upheld the disputed practice of the Nebraska legislature in providing for and funding legislative prayer given by a state-paid chaplain to open each day's session. In doing so, the Court's majority relied on an extensive historical analysis demonstrating the predominance in our nation's history of having chaplains perform the rather ceremonial ritual of an opening prayer for the legislature. *Marsh,* 463 U.S. at 786–90, 103 S.Ct. at 3333–35. The teachings of *Marsh* are extremely limited given the unique historical circumstances surrounding the First Congress and its initial provision for legislative chaplains in the federal legislature. The *Marsh* Court's historical analysis cannot extend to

---

**7.** The plaintiffs argue that the establishment of an active subcommittee of the Legislative Space Needs Commission to carry out the directives of HR 408 presents an entanglement problem already. We are sympathetic with this contention but need not address it in reaching our decision.

**8.** We do not discuss here whether HR 408 could be invalidated under the contention that it might create a "politically divisive" atmosphere along religious lines in the state government. The danger of creating political divisiveness

through government support of religious activity has been discussed as an element of the entanglement test, *Lemon v. Kurtzman,* 403 U.S. 602, 622–23, 91 S.Ct. 2105, 2115–16, 29 L.Ed.2d 745 (1971), but its application in Establishment Clause cases is by no means clear. *See Lynch,* 465 U.S. at 684, 104 S.Ct. at 1364–65, and *Lynch,* 465 U.S. at 703–04, 104 S.Ct. at 1374–75 (Brennan, J., dissenting). Accordingly, we sidestep this inquiry in favor of our analysis in the body of this opinion.

every situation, but must be narrowly read in light of those peculiar circumstances. Accordingly, we do not find its analysis persuasive in the present case.

First, the historical foundations of having chapels or prayer rooms in legislatures are not nearly as extensive as those regarding legislative chaplains. For example, the United States Capitol prayer room was created in 1954 by the Eighty-Third Congress, not the First. H.Con.Res. 60, 68 Stat. B37 (1954).[9] Furthermore, to this Court's knowledge, the Illinois State Capitol Building has never had a prayer room.[10] This differs markedly from the Nebraska state legislature's extensive prayer tradition which was adopted prior to the attainment of statehood, *Marsh*, 463 U.S. at 789–90, 103 S.Ct. at 3335, and the long-standing tradition of legislative chaplains and ceremonial prayers in the United States Congress.

Moreover, the Court in *Marsh* did not rely solely on historical endurance as the constitutional underpinning for its decision. The Court also focused on the historical congruence between the First Congress' drafting and adoption of the First Amendment and its contemporaneous provision for a congressional chaplain to be paid out of public funds. *Id.* at 790–91, 103 S.Ct. at 3335–36. Few, if any, other congressional provisions could find support in this singular legislative history argument. The congressional prayer room, on the other hand, was authorized by the Eighty-Third Congress, a legislative body far removed from the drafting of the First Amendment. In conclusion, we find the teachings of *Marsh* unpersuasive with regard to the outcome of this case.

## C. Accommodation

Finally, we shall briefly address the principal argument raised by the defendants to justify their conduct which is that in enacting HR 408 they merely created a constitutionally permissible accommodation of religion. The idea of religious "accommodation," which has recently been discussed in the context of state support for religious activity, *see, e.g., Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 1359–61, 79 L.Ed.2d 604 (1984), is in the nascent stages of its jurisprudential development. As one commentator recently noted, "the concept of accommodation has not been precisely defined or located within First Amendment doctrine. It remains a label, not a theory." McConnell, *Accommodation of Religion*, 1985 Sup.Ct.Rev. 1, 4 (1985).

■ Accommodation of religion refers to government conduct designed to facilitate the free exercise of religion, which is of course also protected by the First Amendment. The Court has declared that such behavior is affirmatively mandated by the Constitution. *Lynch*, 465 U.S. at 673, 104 S.Ct. at 1359. Nonetheless, the limits of the accommodation idea lie in the plain meaning of the Establishment Clause. Government action which extends beyond mere facilitation of religious practice and resultingly favors one type of practice over another or all practices over none goes beyond the concept of accommodation and represents hostility to the members of the unfavored group.

Ordinarily, the language of accommodation is used to justify government support for the religious practices of those who are denied ordinary access to institutions which promote their particular sect. *See, e.g., Katcoff v. Marsh*, 755 F.2d 223 (2d Cir.

---

**9.** Thus, former Chief Justice Burger's remark that "Congress has *long* provided chapels in the Capitol for religious worship and meditation," *Lynch*, 465 U.S. at 677, 104 S.Ct. at 1361 (emphasis added), must be measured against the extensive historical tradition he wrote about in *Marsh*.

**10.** So far as this Court has been able to ascertain, only seven other states have established prayer or meditation rooms in their state capitol or other legislative buildings. Those states are Arkansas, Florida, Indiana, Kentucky, North Carolina, South Carolina and Texas. This differs from the legislative prayer practice challenged in *Marsh*, which was conducted by "most" states' legislatures. 463 U.S. at 788–89 & n. 11, 103 S.Ct. at 3334–35 & n. 11.

1985) (upholding government provision of military chaplains); *Marsh v. Chambers*, 463 U.S. 783, 812, 103 S.Ct. 3330, 3346–47, 77 L.Ed.2d 1019 (1983) (Brennan, J., dissenting). Unlike those individuals, however, the members of the legislature have no need for special accommodation of their varying religious beliefs as do, for example, the military personnel forced to serve far from their homes as in *Katcoff*, 755 F.2d at 234–35. It would require an astonishing expansion of constitutional doctrine to find that the provision of a prayer room in the Illinois Capitol is affirmatively mandated to promote the free exercise of religion by the members of the legislature. Nor could we seriously treat a claim that this Court's prohibition of a Capitol prayer room would be an impermissible impediment to the free exercise of religion.

 Moreover, any permissible accommodation must be circumscribed by the rights of those who choose to practice personal beliefs different from the religion or religions accommodated. Notwithstanding the recent pronouncements of other courts in Establishment Clause cases, this is not a nation of any particular faith but a nation of free choice and gracious tolerance with respect to the extremely personal matters involving religion.[11] The Court has repeatedly acknowledged that the Establishment Clause was designed to protect indi-

viduals in their choice to practice a particular religion or no religion at all. We find the eloquent words of Justice Stevens appropriate in this context as he observed:

the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Mohammedism or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among "religions"—to encompass into-

11. For example, the recent district court decision in *American Jewish Congress v. City of Chicago*, No. 85 C 9471 slip op. N.D.Ill. Nov. 5, 1986), appears to rely in part on the flawed premise that the Christian roots of the founders of this nation justify government support and display of Christian religious symbols. *Id.* at 10. This opinion thus purports to find constitutional grounding in the values, beliefs and traditions of a historical majority of the population, a contention we feel would be shocking to the founders who themselves fled from majoritarian religious oppression. Nor can we agree, in light of the explicit language of the First Amendment, with the opinion's historical pronouncement that the founders "intended and achieved full religious freedom for all *within the context of a Christian nation.*" *American Jewish Congress,* slip op. at 10 (emphasis added). We find more compelling the Seventh Circuit's recent observations in *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 271 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct.

458, 93 L.Ed.2d 403 (U.S.1986), concerning the constitutionally impermissible action of city government in supporting religious symbols, where the court wrote: "When prominently displayed on a public building that is clearly marked as and known to be such, the cross dramatically conveys a message of governmental support for Christianity, whatever the intentions of those responsible for the display may be." 794 F.2d at 271.

But the implications of the *St. Charles* court's analysis reach beyond circumstances where one particular sect is favored over all others to situations where government support is supplied to all religions. Thus, just as an unmistakably sectarian cross looming over a city hall building manifests government support of the Christian faith, in an equally dramatic sense the public establishment of a prayer room in the Illinois State Capitol conveys an impermissible message of governmental support for all religions notwithstanding the intentions of the defendants herein.

lerance of the disbeliever and the uncertain.

*Wallace v. Jaffree,* 472 U.S. 38, 52–55, 105 S.Ct. 2479, 2488–89, 86 L.Ed.2d 29 (1985) (footnotes omitted). *See also American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 270 (7th Cir.) ("The modern Supreme Court has treated the establishment clause as a directive to the courts to strike down all public acts ... whose primary purpose or predominant effect is to promote one religious group at the expense of others or even promote religion as a whole at the expense of the nonreligious."), *cert. denied,* —— U.S. ——, 107 S.Ct. 458, 93 L.Ed.2d 403 (U.S. Nov. 17, 1986).

 We fully appreciate that the positive values of most organized religions are of great comfort to those who believe. But whether or not to believe is a personal decision. The Establishment Clause was crafted to protect freedom of choice by preventing the government from making that choice for individual citizens. That freedom must, by definition, include the freedom to choose not to practice any religion as well as the freedom to practice a particular religion. For the guarantees of freedom in the First Amendment would indeed be empty ones if the government somehow imposed on citizens the requirement that they must choose to practice any religion, so long as they practice one. The wisdom of the First Amendment is that it mandates that the State protect all religious practice but at the same time requires that it not support any individual faith or religion collectively. Accordingly, we find the accommodation principle inapplicable to the circumstances present in this case and reject the defendants' contention that it saves HR 408 from constitutional invalidation.

### III. REMEDIES

Having determined that HR 408 authorizes impermissible government conduct

"respecting the establishment of religion," we turn to the question of what remedies the plaintiffs are entitled to. In their complaint, Van Zandt and the Foundation sought a declaratory judgment that HR 408 is unconstitutional under the United States and Illinois Constitutions and a preliminary and permanent injunction prohibiting the defendants from further implementation of the resolution.[12] The requested declaratory judgment will be entered by this Court to the effect that HR 408 and the carrying out of activities advancing the conversion of Room 122A of the Capitol to a prayer room by the defendants is hereby declared to be impermissible government conduct respecting the establishment of religion in violation of the First and Fourteenth Amendments.

 Because the Court rules today on cross motions for summary judgment, the analysis regarding plaintiffs' request for a preliminary and permanent injunction can be collapsed into a single inquiry. *Cf.* Fed. R.Civ.P. 65(a)(2) (authorizing the combining of a preliminary injunction hearing with an accelerated hearing on the merits). The time-honored test for evaluating the propriety of a preliminary injunction is that the injunction should be granted:

> when the plaintiff has suffered an irreparable injury for which there is no adequate remedy at law and where the balance of the equities, reflecting the relative harm to each party entailed in granting or denying the injunction, the probable outcome of a trial on the merits, and the public interest, is determined by the district judge to favor the movant.

*Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1441 (7th Cir.1986). At this point, we have already determined that the plaintiffs have prevailed on the merits and accordingly the "probable outcome" element of the inquiry can be bypassed. The principal inquiries remaining following a determination by the district court that there has been a constitutional violation are

---

12. Plaintiffs also requested attorneys' fees, presumably under 42 U.S.C. § 1988 (1982). The court will not rule on that request at this time, but will entertain a formal attorneys' fees motion with adequate supporting brief and exhibits at a later date.

whether the plaintiff will suffer irreparable harm if a permanent injunction is not issued and whether an adequate remedy at law exists which would compensate for that injury. *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983).

 In assessing injury to the plaintiffs in an Establishment Clause case, we are not confined to considering only the injuries on which standing is based. *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 275 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 458, 93 L.Ed.2d 403 (U.S.1986).[13] The Court can also consider the larger impact of the defendants' conduct on the interests protected by the Establishment Clause in the absence of an injunction. *Id.* (This can also be characterized as one aspect of the "public interest" inquiry in the injunction test.) We conclude that irreparable harm will result if the injunction is not entered. Impermissible restriction of First Amendment rights is often equated presumptively with irreparable harm, *Burelle v. City of Nashua,* 599 F.Supp. 792, 793–94 (D.N.H.1984),[14] but there is more than a presumption of harm here. The presence of a special room imbued with a religious purpose, a room which heretofore has been used as a place to hold hearings on the merits of pending legislation, may discourage those whose individual beliefs do not conform with the majority of citizens from participating in the democratic process. As Justice O'Connor aptly observed in her concurring opinion in *Lynch,* "[e]ndorsement [of religion] sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." 465 U.S. at 688, 104 S.Ct. at 1366. Perhaps nowhere is it more important, then, for the government to preserve the

face of neutrality toward any particular religion or toward all religions than in the halls of its legislature. And nowhere else is it more important for individuals to not be subjected to feeling like "outsiders," a constitutional concern in any setting where the government appears to be placing its imprimatur on religion of any kind or all kinds.

Furthermore, it is clear that the plaintiffs cannot receive adequate relief through an action at law. Even if individuals objecting to the prayer room were allowed to recover damages equal to the portion of their tax money which would be used to support the prayer room, the harm discussed above would not be alleviated.

Finally, no harm will be suffered by the defendants if they are prohibited from continuing their plans to convert the hearing room to a prayer room. They have not argued that they will suffer unduly by not being permitted to follow through on HR 408. We do not cast any aspersion as to the motivations of those defendant legislators who feel that the opportunity for spiritual renewal will enable them to perform their legislative duties with greater serenity. But the Illinois Capitol Building is not located in a wilderness. Springfield is a thriving municipality in which houses of worship for the religious of all persuasions can be found within a few minutes walk or drive from the State Capitol. Thus, we can see no harm in preserving the Illinois Capitol as it always has been—without a prayer room.

Accordingly, the Court shall enter an injunction to the following effect:

Defendants James R. Thompson, Governor of the State of Illinois, Michael Madigan, Speaker of the Illinois House of Representatives, Lee Daniels, Minority Leader of the Illinois House of Representatives, Mal Hildebrand, Bruce Farley, John Davidson and Roger Keats,

---

**13.** As the Seventh Circuit noted in *St. Charles,* the interests promoted by the injury requirement of the standing question are distinct from those protected by the injury element of the injunction inquiry. 794 F.2d at 274–75.

**14.** *Cf. St. Charles,* 794 F.2d at 274 (distinguishing between violations which affirmatively infringe on speech or religious freedom rights and those involving Establishment Clause claims).

Senators of the Illinois Senate, all individually and in their respective official capacities, Jim Edgar, in his official capacity as Custodian of the Illinois State Capitol Building, James H. Donnewald, in his official capacity as Treasurer of the State of Illinois and Roland W. Burris, in his official capacity as Comptroller of the State of Illinois and their successors are hereby permanently enjoined from carrying out the directives of House Resolution 408, passed by the Illinois House of Representatives on or about May 20, 1985, relating to the planning, creation, establishment or conversion of Room 122A of the Illinois State Capitol Building in Springfield, Illinois, as a prayer room. This injunction prohibits the use of state employees on state property or during working hours from implementing any of the proposals in HR 408 to establish a prayer room in the Illinois State Capitol Building. It is so ordered.

In accordance with this opinion, this Court finds that there are no genuine issues of material fact in this case and that the plaintiffs are entitled to judgment as a matter of law and the defendants are not entitled to judgment as a matter of law. Accordingly, the plaintiffs' motion for summary judgment will be allowed, and the defendants' motion for summary judgment is denied. It is so ordered.