H. THOMAS COLO & others[1] vs. TREASURER AND
RECEIVER GENERAL.

Suffolk. April 2, 1979. — July 31, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

Constitutional Law, Establishment of religion, Equal protection of
laws. General Court, Chaplains. Supreme Judicial Court,
Justiciable question.

Judicial resolution of a controversy with respect to the constitutional-
ity of G. L. c. 3, § 14, authorizing the expenditure of public funds to
pay the salaries of the chaplains of the Massachusetts House of
Representatives and the Senate, would not violate either the doc-
trine of the separation of powers or the political question doctrine.
[552-553]

The appointment of Roman Catholic priests as the chaplains of the
Massachusetts House of Representatives and the Senate for over
the past twenty years was not shown to be a violation of the equal
protection clause of the Fourteenth Amendment to the United
States Constitution where there was no demonstration that any
other person had been denied appointment or that the appoint-
ments were based on religious discrimination. [557-558]

Neither G. L. c. 3, § 14, authorizing the expenditure of public funds to
pay the salaries of the chaplains of the Massachusetts House of
Representatives and the Senate, nor the expenditure of public
funds pursuant thereto violates the First Amendment to the Feder-
al Constitution or cognate provisions of the Massachusetts Consti-
tution. [558-561]

---

[1] Edward Landau, Sandra Landau, Robert D. Martin, Paul Spiro
Rapo, Ronald A. Pina, Max Volterra, Norma Beit, Leonard McCarthy,
Jr., Dean Albertson, Frances A. Bigda, Ellen D. Heye, Rudolph C.
Praetz, Hanna G. Tauber, Walter F. Tauber, Carol C. Amick, Kenneth
F. Collyer, Natasha Lisman, Lois G. Pines, John W. Roberts, Meryl
Schulman, Laurence R. Buxbaum, Gilbert W. Cox, Jr., Margaret V.
Gardocki, Margaret M. Kelley, Pamela Lee Lowry, Alfred Almeida,
Lia Glovsky, and Marsha Semuels.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 22, 1975.

The case was reported by *Braucher, J.*

*Michael Broad* for the plaintiffs.

*Andrew J. McElaney, Jr.,* Assistant Attorney General, for the defendant.

QUIRICO, J. The plaintiffs, twenty-nine taxable inhabitants of the Commonwealth, brought suit under G. L. c. 29, § 63, to restrain the defendant from expending any public monies to pay the salaries of the chaplains of the Massachusetts House of Representatives and the Senate, and for a declaration that G. L. c. 3, § 14, which authorizes such payment, is unconstitutional. The case was reserved and reported by a single justice, and it is before us for decision on pleadings and the parties' stipulation of facts.

We conclude that neither the statute nor the expenditure of public funds pursuant thereto violates any constitutional provision.

We summarize the facts on which the parties have agreed. The House and the Senate each employ a chaplain. The primary duty of these chaplains is to open each daily legislative session with a brief prayer. Attendance by the members during the opening prayer is voluntary. The chaplains are also available to members of the Legislature for religious and secular consultation and counseling.

The chaplain of the House since 1955 has been the Reverend George Kerr, and the chaplain of the Senate since 1959 has been the Reverend Christopher P. Griffin. Both are Roman Catholic priests. Visiting ministers of various faiths, usually at the request of members of the Legislature, occasionally give the opening prayer without compensation, but the vast majority of these invocations are given by the chaplains. Each day's prayers are printed in the journals of the respective branches of the Legislature.

General Laws c. 3, § 14, authorizes the rules committee of each branch to set a salary for the chaplain of that

branch. For fiscal year 1978-1979, the Legislature appropriated $9,550 for the salary of the Senate chaplain and $7,883 for the salary of the House chaplain. St. 1978, c. 367, § 2, items 0113-000 and 0123-000. It is the expenditure of public funds for payment of these salaries that the plaintiffs contend violates the First Amendment to the United States Constitution,[2] the equal protection clause of the Fourteenth Amendment to the United States Constitution,[3] and arts. 2 and 3 of the Massachusetts Declaration of Rights, and art. 18, § 2, of the Articles of Amendment to the Massachusetts Constitution.[4]

1. Before reaching the merits of these constitutional questions, we consider the defendant's contention that this controversy is not susceptible of judicial resolution because any attempt by this court to resolve it would

---

[2] This Amendment reads in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[3] The pertinent part of the Fourteenth Amendment reads, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[4] Article 2 of the Massachusetts Declaration of Rights provides, "It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the SUPREME BEING, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship."

Article 3 of the Massachusetts Declaration of Rights, as amended by art. 11 of the Articles of Amendment to the Massachusetts Constitution, provides in part, "[A]ll religious sects and denominations, demeaning themselves peaceably, and as good citizens of the commonwealth, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law."

Article 18, § 2, as amended by art. 103 of the Articles of Amendment to the Massachusetts Constitution, provides, "[N]o . . . grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society."

violate either the doctrine of the separation of powers, art. 30 of the Massachusetts Declaration of Rights, or the political question doctrine. The defendant contends that both branches of the Legislature are authorized by our Constitution (Part II, c. 1, § 2, art. 7, and § 3, art. 10[5]) to establish their own rules of proceedings, that both branches have exercised these powers to establish rules calling for the appointment of chaplains, and that these are "internal procedures," the propriety of which this court has no power to adjudicate. The subject at issue, however, contrary to the defendant's characterization of it, is not an "internal" rule of the Legislature, but the constitutionality of a statute (G. L. c. 3, § 14) which authorizes a certain expenditure of public funds for a specified purpose. On its face, G. L. c. 29, § 63, gives this court power to restrain the expenditure of public funds where there is no "constitutional right and power" to use them for the intended purpose. The plaintiffs contend that these payments are for a purpose which is not constitutionally permitted. Without in any way attempting to invade the rightful province of the Legislature to. conduct its own business, we have the duty, certainly since *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 178 (1803), to adjudicate a claim that a law and the actions undertaken pursuant to that law conflict with the requirements of the Constitution. "This," in the words of Mr. Chief Justice Marshall, "is of the very essence of judicial duty."

2. The Legislature of each of the fifty States and of the Federal government begins each day with an opening prayer. Like Massachusetts, seventeen other States and the United States Congress employ a chaplain or chap-

---

[5] Part II, c. 1, § 2, art. 7, of the Massachusetts Constitution provides, "The senate shall choose its own president, appoint its own officers, and determine its own rules of proceedings."

Part II, c. 1, § 3, art. 10, of the Massachusetts Constitution provides in part, "The house of representatives shall ... appoint their own officers, and settle the rules and orders of proceeding in their own house."

lains for this purpose.[6] Plaintiffs' and defendant's joint exhibit A. A.P. Stokes & L. Pfeffer, Church and State in the United States 84 (rev. ed. 1960). Despite the universality of this practice of opening prayers, this appears to be the first case in which the constitutionality of the expenditure of public funds for such a purpose has been put in issue.[7] In considering this question of first impression, we are mindful of the words of Mr. Justice Powell that "[i]t has never been thought either possible or desirable to enforce a regime of total separation [between church and State], and as a consequence cases arising under these Clauses have presented some of the most perplexing questions to come before this Court." _Committee for Pub. Educ. & Religious Liberty_ v. _Nyquist_, 413 U.S. 756, 760 (1973). There are no simple tests or precise lines by which we can determine the constitutionality of the challenged payments. See _Meek_ v. _Pittenger_, 421 U.S. 349, 359 (1975); _Lemon_ v. _Kurtzman_, 403 U.S. 602, 612 (1971); _School Dist. of Abington_ v. _Schempp_, 374 U.S. 203, 231 (1963) (Brennan, J., concurring). In reaching a conclusion, we must view the purposes and history of the practice in relation to the purposes and history of the governing constitutional amendments,[8] and in the light of what can be gleaned from decisions on somewhat similar practices by other State and Federal courts.

---

[6] Those States which do not employ chaplains rely on paid or volunteer rotating clergy, or in a few cases on legislators or legislative staff to offer the prayer. Joint exhibit A.

[7] The issue of the constitutionality of the legislative chaplains employed by the United States Congress was raised in _Elliot_ v. _White_, 23 F.2d 997 (D.C. Cir. 1928). However, the plaintiff's complaint in that case was dismissed, without any consideration of the merits, on the ground that under _Massachusetts_ v. _Mellon_, 262 U.S. 447 (1923), the plaintiff (as a taxpayer) had no standing to bring the complaint. General Laws c. 29, § 63, provides the necessary standing for the plaintiffs here.

[8] The First Amendment to the United States Constitution is made applicable to the States by the Fourteenth Amendment. _Murdock_ v. _Pennsylvania_, 319 U.S. 105, 108 (1943).

The motivation for and history of the passage of the
First Amendment have been discussed at some length in
opinions of various Justices of the United States Supreme
Court, and no purpose would be served by repeating this
history in detail. See, e.g., *Everson* v. *Board of Educ. of
Ewing,* 330 U.S. 1, 8-15 (1947); *id.* at 33-43 (Rutledge, J.,
dissenting); *McGowan* v. *Maryland,* 366 U.S. 420, 437-441
(1961); *Walz* v. *Tax Comm'n of City of N.Y.,* 397 U.S. 664,
704-727 (1970) (Douglas, J., dissenting). Certainly, the de-
gree of intermingling of religious and secular life was
much greater at the time the First Amendment was being
debated than it is today. Most of the original States, in-
cluding Massachusetts, had established churches sup-
ported directly by tax dollars, and there was often little
tolerance for dissenting religious views. The drafters and
ratifiers of the First Amendment designed it to address
far more pervasive threats to religious liberty and the
separation of church and State than any that exist today.
See *School Dist. of Abington* v. *Schempp,* 374 U.S. 203,
237 (1963) (Brennan, J., concurring). In this context, em-
ployment of legislative chaplains does not appear to have
been a source of concern. Although there is evidence that
James Madison, who was one of the leading proponents
of the First Amendment, had private doubts about the
validity of the appointment of legislative chaplains,[9] no

___

[9] In his Detached Memoranda, published after his retirement from
the presidency, Madison wrote: "Is the appointment of Chaplains to
the two Houses of Congress consistent with the Constitution, and with
the pure principle of religious freedom?

"In strictness the answer on both points must be in the negative.
The Constitution of the United States forbids everything like an estab-
lishment of a national religion. The law appointing Chaplains estab-
lishes a religious worship for the national representatives, to be per-
formed by Ministers of religion, elected by a majority of them; and
these are to be paid out of the national taxes. Does not this involve the
principle of a national establishment, applicable to a provision for a
religious worship for the Constituent as well as of the representative
Body, approved by the majority, and conducted by Ministers of reli-
gion paid by the entire nation." Quoted in A. P. Stokes & L. Pfeffer,
Church and State in the United States 481 (rev. ed. 1964).

serious objections to the practice appear to have been raised. Opening invocations were accepted as a matter of course at a wide range of public occasions, including legislative sessions, presidential inaugurations, and the opening of terms of court.

In Massachusetts, the original Declaration of Rights, adopted in 1780, provided for public financial support of the Christian religion.[10] Not until 1833 was the present art. 3 (see note 4, *supra*) substituted for this provision, ending direct public support of religion. A second major issue concerning the appropriation of public funds for religious purposes was debated at the Constitutional Convention of 1917-1918, when various amendments were proposed to prohibit public funding of parochial schools. Cf. *Bloom* v. *School Comm. of Springfield*, 376 Mass. 35 (1978); *Haddad* v. *School Comm. of Worcester*, 376 Mass. 51, 52 (1978). Throughout this history of often vigorous debate about the proper relationship between church and State, the appointment and payment[11] of legislative chaplains continued without apparent dissension. As one delegate (John W. McAnarney of Quincy) to the 1917-1918 Constitutional Convention remarked, the sentiment which led to the convention's approval of an "anti-aid amendment" was not that "the State is opposed to religion, . . . [we] bear testimony to that every morning in this Convention, sir, when we have the divine aid and assistance invoked to guide us in our deliberations." 1 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 190 (1918).

---

[10] Prior to 1833, art. 3 read in pertinent part, "[T]he legislature shall, from time to time, authorize and require, the several towns, parishes, precincts, and other bodies politic, or religious societies, to make suitable provision, at their own expense, for the institution of the public worship of GOD, and for support and maintenance of public Protestant teachers of piety, religion, and morality . . . ."

[11] Statute 1858, c. 2, "An Act to regulate the compensation of members, officers and attendants of the legislature," provided that an annual salary of $200 be paid to "the chaplains of the senate and house of representatives." *Id.* § 6. This statute, amended in 1872, 1879, 1913, 1920, and 1948, is the predecessor to G. L. c. 3, § 14.

Of course, the mere fact that a certain practice has gone unchallenged for a long period of time cannot alone immunize it from constitutional invalidity, "even when that span of time covers our entire national existence and indeed predates it." *Walz* v. *Tax Comm'n of the City of N.Y.*, 397 U.S. 664, 678 (1970). The long history of a certain practice, however, and its acceptance as an uncontroversial part of our national and State tradition do suggest that we should reflect carefully before striking it down.

The plaintiffs advance a second argument. Even if the appointment of legislative chaplains were permissible under the First Amendment (and cognate provisions of the Massachusetts Constitution), they contend the appointment of Roman Catholic priests as the chaplains of the House and the Senate since 1955 and 1959 respectively is a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution, since it discriminates against other religions. It is an open question whether these plaintiffs have standing to raise such equal protection claims or whether such claims may be advanced only by clergy of faiths other than Roman Catholic. See, e.g., *McGowan* v. *Maryland*, 366 U.S. 420, 429 (1961); *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n (No. 1)*, 374 Mass. 547, 556-557 (1978). In any event, there is no showing on this record that any violation of equal protection has occurred. The mere fact that two persons of a particular faith have been appointed to these positions for over the past twenty years does not demonstrate that any other person has ever been denied appointment (a necessary element of any equal protection claim), or that such decisions were based on religious discrimination. In fact, although it is not a part of the record, we take notice that not all legislative chaplains in Massachusetts have been Roman Catholic.[12] (For names of Senate and House chap-

_____

[12] But cf. James Madison's views on the equal protection issue in his Detached Memoranda, *supra* note 9: "The establishment of the Chap-

lains from 1780 to date see Manual for the General Court, 1977-1978, at 388-389, 392-393.)

In determining the constitutionality of G. L. c. 3, § 14, we are aided by the criteria which have been established by the United States Supreme Court for judging claims arising under the First Amendment, which criteria we believe are equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution. These criteria involve the application of the following three "tests:" (1) is there a "secular legislative purpose," (2) does the primary effect of the challenged practice "neither advance nor inhibit religion," and (3) is there avoidance of "excessive government entanglement" with religion? *Lemon* v. *Kurtzman,* 403 U.S. 602, 612-613 (1971). *Arno* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 83, 91 (1979). We also note that the Supreme Court has cautioned that these "tests" are not "precise limits to the necessary constitutional inquiry," but are instead guidelines to a proper analysis. *Meek* v. *Pittenger,* 421 U.S. 349, 359 (1975). Indeed, there is a "significant fourth factor" implicit in the analysis the Court has undertaken — that is, whether the challenged practice has a "divisive political potential." *Meek* v. *Pittenger, supra* at 374 (Brennan, J., concurring in part and dissenting in part). Applying these criteria to the statute before us, not as mechanistic "tests" but as guidelines to analysis, we find support for the conclusion that the statute is constitutional.

---

lainship to Congress is a palpable violation of equal rights, as well as of Constitutional principles: The tenets of the chaplains elected [by the majority] shut the door of worship against the members whose creeds and consciences forbid a participation in that of the majority. To say nothing of other sects, this is the case with that of Roman Catholics and Quakers who have always had members in one or both of the Legislative branches. Could a Catholic clergyman ever hope to be appointed a Chaplain? To say that his religious principles are obnoxious or that his sect is small, is to lift the evil at once and exhibit in its naked deformity the doctrine that religious truth is to be tested by numbers, or that the major sects have a right to govern the minor." A.P. Stokes & L. Pfeffer, Church and State in the United States 481-482 (rev. ed. 1964).

The secular purposes of opening invocations are the maintenance of long tradition and the continuation of a ritual which prompts legislators to reflect on the gravity and solemnity of their responsibilities and of the acts they are about to perform. Although the opening prayers have a religious nature, it cannot be said that their primary effect is to advance religion. In this respect, such invocations are easily distinguishable from the practice of daily prayer or Bible reading in the schools. There the State, by incorporating religious exercises into the context of a compulsory school day, lends at least implicit support to the notion that children should be indoctrinated to accept religion. The purpose of a school is to teach impressionable children, many of whom, because of their ages, cannot be expected to comprehend that school-sponsored prayers are not necessarily "lessons" to be learned like other aspects of the school program. Cf. *Bloom* v. *School Comm. of Springfield,* 376 Mass. 35 (1978); *Haddad* v. *School Comm. of Worcester,* 376 Mass. 51, 52 (1978). By contrast, mature legislators may reasonably be assumed to have fully formed their own religious beliefs or nonbeliefs. The provision of a ceremonial moment of meditation at the opening of the legislative session is unlikely to advance religious belief either among the legislators or their constituency, even if it does give recognition to the traditional place that prayer has occupied in such a ritual for two centuries.

There is no evidence that a great degree of government entanglement with religion is occasioned by the employment of legislative chaplains. The prayers offered are brief, the content unsupervised by the State, and attendance completely voluntary. There is no evidence that the State has become embroiled in any difficult decisions about which religions are to be represented or what sorts of invocations are to be offered. As far as the record reveals, there is not the slightest hint that the practice of employing legislative chaplains has ever created any of the political divisiveness which "was one of the principal

evils against which the First Amendment was intended to protect." *Lemon* v. *Kurtzman*, 403 U.S. 602, 622 (1971).

While we have found no cases concerned precisely with the appointment or compensation of legislative chaplains, we do note that other courts have approved the practices of opening town meetings with invocations by unpaid clergy (*Lincoln* v. *Page*, 109 N.H. 30 [1968]), of opening county board meetings with prayer by clergy (*Bogen* v. *Doty*, 598 F.2d 1110 [8th Cir. 1979], aff'g 456 F. Supp. 983 [D. Minn. 1978]), and of offering prayers and invocations at public high school graduations (*Wiest* v. *Mt. Lebanon School Dist.*, 457 Pa. 166 [1974], *Grossberg* v. *Deusebio*, 380 F. Supp. 285 [E.D. Va. 1974], *Wood* v. *Mt. Lebanon Township School Dist.*, 342 F. Supp. 1293 [W.D. Pa. 1972]). Various Justices of the United States Supreme Court have suggested, in dicta, that the appointment of legislative chaplains is an example of the kind of practice permissible under the First Amendment, like the motto "In God We Trust" on our money or the phrase "Under God" in the pledge of allegiance, even though all these have a religious dimension. *School Dist. of Abington* v. *Schempp*, 374 U.S. 203, 213 (1963) (Clark, J.). *Id.* at 299 (Brennan, J., concurring). *Engel* v. *Vitale*, 370 U.S. 421, 444 (1962) (Stewart, J., dissenting). *Zorach* v. *Clauson*, 343 U.S. 306, 313 (1952) (Douglas, J.). *Illinois ex rel. McCollum* v. *Board of Educ. of School Dist. No. 71*, 333 U.S. 203, 253 (1948) (Reed, J., dissenting). But cf. *Engel* v. *Vitale*, 370 U.S. 421, 439-442 (1962) (Douglas, J., concurring) (implies prayers by legislative chaplains are unconstitutional).

As this court has recently commented, "the 'hermetic separation' of church and State is an impossibility which the Constitution has never required." *Arno* v. *Alcholic Beverages Control Comm'n*, 377 Mass. 83, 91 (1979). The United States Supreme Court has elaborated on this point, stating "[t]he First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the

manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise, the state and religion would be aliens to each other — hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths — these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment." *Zorach* v. *Clauson, supra* at 312-313.

The complete obliteration of all vestiges of religious tradition from our public life is unnecessary to carry out the goals of nonestablishment and religious freedom set forth in our State and Federal Constitutions. We do not think either the Massachusetts or United States Constitutions require the cessation of the practices challenged here. The case is remanded to the Supreme Judicial Court for the county of Suffolk, where judgment is to be entered denying the plaintiffs' request for an injunction and declaring that G. L. c. 3, § 14, and the expenditure of funds pursuant thereto are constitutional.

*So ordered.*