**Stephen C. VAN ZANDT and Freedom From Religion Foundation, Inc., a Wisconsin not-for-profit corporation, Plaintiffs–Appellees,**

v.

**James R. THOMPSON, Governor of the State of Illinois, et al., Defendants–Appellants.**

**No. 87–1018.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1987.

Decided Jan. 29, 1988.

William D. Frazier, Chicago, Ill., for defendants-appellants.

Donald S. Rothschild, Donald S. Rothschild & Assoc., Ltd., Oak Park, Ill., for plaintiffs-appellees.

Before CUDAHY, POSNER and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs brought a lawsuit challenging the validity and seeking to prevent the implementation of House Resolution 408 ("H.R. 408"), passed in May 1985 by the Illinois House of Representatives. The Resolution authorized the establishment of a "prayer room" in the Illinois State Capitol Building in Springfield, Illinois, a place for "prayer and meditation, primarily for the use of the members of the General Assembly." The district court granted plaintiffs' motion for summary judgment holding, *inter alia*, that H.R. 408 was unconstitutional under the establishment clause of the first amendment to the United States Constitution. The court granted declaratory and permanent injunctive relief in favor of the plaintiffs. We reverse.

## I.

In May 1985, Michael Madigan, speaker of the Illinois House of Representatives, introduced legislation, designated House Resolution 408, which provided for the conversion of a hearing room in the Illinois State Capitol Building ("the Capitol") into a prayer room. Shortly thereafter, H.R. 408 was adopted by the full House. The Resolution directed the Legislative Space Needs Commission to "make available a room with facilities for prayer and meditation, primarily for the use of the members of the General Assembly."

The Resolution tries to put the religious facet of the proposal in perspective by enumerating religious observances and allusions to God in public life. Specifically, the Resolution points to prayers offered by military and legislative chaplains, to language in the Gettysburg Address, in the Preamble to the Illinois Constitution and in a pledge of allegiance taken by Illinois legislators, and to mottoes on United States coins and stamps. In addition, the Resolution describes the prayer room that Congress established in the United States Capitol in 1955. H.R. 408, paras. 1–4, 12. Against this general background, the Resolution describes the origins of the proposal for a prayer room in the state capitol. According to the Resolution, the idea was conceived by some General Assembly members who had been meeting for Bible study and prayer breakfasts as a "quiet and special

place, where [the] members of the [General Assembly] may seek God, the comfort of His presence, the light of His guidance, and the strength of His love." *Id.* at para. 13. The Resolution acknowledges state constitutional prohibitions on the expenditure of state funds for sectarian or other than public purposes, but anticipates avoiding these strictures by making the room nonsectarian and assuring its availability to all the people of the state. *Id.* at paras. 10–11. To alleviate any remaining fiscal objections, the Resolution contemplates that private donations will be raised to cover the cost of renovating and maintaining the room. *Id.* at paras. 11, 15.

The Legislative Space Needs Commission has met to plan for the prayer room, and approved the recommendation of a special subcommittee (created by H.R. 408) that the prayer room be established in Room 122A of the Capitol. No specific plans for furnishing or decorating the room have yet been adopted. The Commission has, however, discussed hiring an architect and the possibility of installing pews.

On February 6, 1986, the plaintiffs filed an action in district court challenging the endorsement, establishment and maintenance of a prayer room in the Capitol and seeking declaratory and injunctive relief against the defendants under the establishment clause of the first amendment of the United States Constitution and under article I, section 3 of the Illinois Constitution.

The parties filed cross-motions for summary judgment and the district court granted the plaintiffs' motion. The district court held H.R. 408 unconstitutional under the first and fourteenth amendments of the United States Constitution and article I, section 3 of the Illinois Constitution. The court entered a declaratory judgment invalidating H.R. 408 and a permanent injunction prohibiting any actions to establish a prayer room in the Capitol. In reaching this outcome the district court purported to apply the three-part test articulated in

*Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[1] This appeal followed.

### II.

The district court held and neither of the parties has disputed that Van Zandt has standing to sue since he is an Illinois taxpayer and since the proposed prayer room would arguably place economic burdens of various sorts on the State of Illinois and its taxpayers. *Van Zandt v. Thompson,* 649 F.Supp. 583, 587 (N.D.Ill.1986) (citing *Marsh v. Chambers,* 463 U.S. 783, 786 n. 4, 103 S.Ct. 3330, 3333 n. 4, 77 L.Ed.2d 1019 (1983)). Similarly, the district court held that the "Freedom from Religion Foundation, Inc.," a Wisconsin not-for-profit corporation, has associational standing as a representative of its members who are Illinois taxpayers. *Id.* at 588 n. 4. These determinations appear to be correct and have not been challenged by any of the parties. We therefore accept them.

### III.

Before discussing the merits, we should clarify the scope of our inquiry. This case presents us with a legislative resolution that combines both secular and religious justifications for converting a hearing room in the state capitol to a room for prayer and meditation. The prayer room, at present, is no more than a general plan. There is no indication of how the converted room will be furnished apart from a proposal to use pews that the state obtained prior to the enactment of H.R. 408 when it purchased a church near the Capitol. Nor is there any indication of the types of activities that will be conducted in this room. The Resolution and the preliminary steps taken by the Space Needs Commission are consistent with a broad range of eventualities, ranging from individuals meditating silently in a room entirely devoid of religious ornamentation to clergy conducting

---

1. The district court treated Illinois' constitutional prohibition on the establishment of religion as identical to the establishment clause prohibition under the United States Constitution. *Van Zandt v. Thompson,* 649 F.Supp. 583, 588 (N.D. Ill.1986) (citing *People ex rel. Klinger v. Howlett,* 56 Ill.2d 1, 3–4, 305 N.E.2d 129, 130 (1973)). Since no party has challenged this view of Illinois law, we confine our discussion to federal establishment clause cases.

denominational services in a chapel replete with sectarian trappings.

■ Our review at this stage is limited to the question of whether H.R. 408, considered together with the preliminary administrative actions taken to date, violates the establishment clause. In a system that appoints judges for life and empowers them to review the legality of legislation, a cardinal principle of judicial self-restraint dictates that they not " 'anticipate a question of constitutional law in advance of the necessity of deciding it.' " *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)). Even in free speech cases, where concerns about the chilling of protected expression have given rise to the doctrine of "substantial overbreadth," *see, e.g., Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634, 100 S.Ct. 826, 835, 63 L.Ed.2d 73 (1980), plaintiffs must generally show that a statute is unconstitutional as applied, not merely that it may be interpreted to authorize unconstitutional actions. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–04, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394 (1985); *see also id.* at 508, 105 S.Ct. at 2804 (O'Connor, J., concurring) ("this Court has long recognized that concerns for comity and federalism may require federal courts to abstain from deciding federal constitutional issues that are entwined with the interpretation of state law"). In keeping with this principle, we consider only how H.R. 408 itself squares with the establishment clause. We decline to speculate about constitutional issues that may be raised by the ultimate contents and uses of the prayer room.

## IV.

■ The central issue in this litigation has been whether the matter before us is governed by the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) or by the principles of *Marsh v. Chambers*, 463 U.S.

783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). We believe that *Marsh* properly governs this case. But even if we have lost our way in the tangle of establishment clause doctrine and *Lemon* in fact controls, we find that H.R. 408, on its face, poses no violation.

### A.

The issue in *Marsh* was whether the Nebraska legislature's practice of opening each session with a prayer read by a state-employed chaplain violated the establishment clause. Since 1965, the legislature had employed a Presbyterian minister as its chaplain. All the prayers read by the chaplain invoked the Deity; for a time (prior to a complaint by a Jewish legislator) many were "explicitly Christian." 463 U.S. at 793 n. 14, 103 S.Ct. at 3337 n. 14.

We have discovered very few cases other than *Marsh* that consider an establishment clause challenge to the internal religious practices of state legislative bodies or the Congress. Those cases have uniformly upheld the practice of opening legislative sessions and other similar gatherings with prayers. *Bogen v. Doty*, 598 F.2d 1110 (8th Cir.1979) (opening of county board meetings with prayer by unpaid clergy); *Colo v. Treasurer and Receiver Gen.*, 378 Mass. 550, 392 N.E.2d 1195 (1979) (opening of legislative sessions with prayer by paid clergy); *Lincoln v. Page*, 109 N.H. 30, 241 A.2d 799 (1968) (opening of town meeting with prayer by unpaid clergy).

The Supreme Court's historical analysis in *Marsh* found that practices similar to those of the Nebraska legislature had been followed by the United States Congress at the time the first amendment was drafted. 463 U.S. at 788, 103 S.Ct. at 3334. The Court also found that legislative chaplains had been employed continuously in most of the states. *Id.* at 788–89 & n. 11, 103 S.Ct. at 3334–35 n. 11. From the prevalence of these practices, the Court concluded that the framers of the first amendment did not view paid legislative chaplains and opening prayers as an "establishment of religion."

In addition to analyzing the historical roots of legislative chaplaincy, the Court examined whether the particular features of the Nebraska legislative chaplaincy violated the establishment clause, focusing on the motives of the legislature in employing a Presbyterian minister and on the content of the opening prayers. *Id.* at 793–95, 103 S.Ct. at 3337–38. With respect to the choice of a clergyman of one denomination, the Court considered whether such a practice "advances the beliefs of a particular church" and concluded that it did not. *Id.* at 793, 103 S.Ct. at 3337. Similarly, the content of the prayers was held not to pose any real question absent some indication that "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95, 103 S.Ct. at 3338. Thus, *Marsh* contradicts the view that legislative prayer violates the establishment clause merely because it is religious in nature.

The district court viewed *Marsh* as "a decision wedded to the unique historical circumstances" of that case—a one-time departure from the Court's consistent application of the *Lemon* criteria to establishment clause cases. 649 F.Supp. at 591. The appellees, of course, support this interpretation, arguing that *Marsh*'s historical analysis applies only to specific practices with deep historical roots and that the defendants must fail because there is no record of a prayer room linked to the legislative chamber of the First Congress, nor any longstanding history of prayer rooms in other legislative precincts.

In our opinion this is much too crabbed a view. Based on *Marsh* we are inclined to view a legislature's internal spiritual practices as a special case. We read *Marsh* to derive partly from the traditions of the nation and of the states and partly from a degree of deference to the internal spiritual practices of another branch of government or of a branch of the government of another sovereign. The Illinois legislature's argument from tradition, while weaker than the Nebraska legislature's argument from tradition in *Marsh*, has some force. Defendants cannot point to the establishment of a prayer room by the First Congress or to a long and unbroken practice of state legislatures' providing such facilities. They can, however, point to a broader tradition, discussed in *Marsh*, of legislatures' acknowledging, in relatively modest and nonintrusive ways, some role for spiritual values in their work. We do not read *Marsh* as limiting this tradition to the specific practices that date back to the enactment of the Bill of Rights.

Apart from historical considerations, the case for deference to the legislature's ordering of its own internal affairs is, if anything, stronger in this case than in *Marsh*. The Nebraska legislature's chaplain appeared publicly at the opening of each legislative session to deliver a prayer, a service for which he was paid from public revenues. Any legislator or observor who wished to avoid this ceremony was obliged to leave the legislative chambers. The proposed prayer room, while open to the public, need not impose any inconvenience on anyone who wishes to avoid it.[2] Legislators and visitors to the Illinois Capitol will presumably be able to exercise their perogatives as "mature adults" and avoid the room without even the bother of "absent[ing] themselves from [a] public and ceremonial exercise[ ]." *Abington School Dist. v. Schempp*, 374 U.S. 203, 299–300, 83 S.Ct. 1560, 1612, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) (discussing legislative prayer); *see also Marsh*, 463 U.S. at 792, 103 S.Ct. at 3336 (distinguishing legislators from school children in susceptibility to indoctrination and peer pressure). *But see Marsh*, 463 U.S. at 796 & n. 2, 103 S.Ct. at 3338 & n. 2 (Brennan, J., dissenting) (rejecting earlier view in *Schempp*).

---

**2.** The purposes of the prayer room distinguish it from the creche display in Chicago's City Hall that this court disallowed on establishment clause grounds in *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987). The creche, this court found, sent "a message to the people of Chicago that the city approved of Christianity." *Id.* at 128. We can certainly imagine a room for prayer and meditation created under the terms of H.R. 408 that would convey no such message.

H.R. 408 also compares favorably to the Nebraska chaplaincy on grounds of public expense. The amount of any public expense that the prayer room might require is, of course, unknown at this time. Based on the Resolution, however, it is certainly conceivable that the Illinois legislature's prayer room will involve lower public expenditures than the Nebraska chaplaincy. Indeed, H.R. 408 suggests that *no* public expense will be incurred beyond the cost of relocating any hearings displaced by the conversion of the hearing room, expressing "the intent that private donations shall ultimately finance the cost of any renovation" and calling for "the raising of private donations to fund ... operation and maintenance."

Legislators are not immune from the strictures of the establishment clause with respect even to their internal practices. But *Marsh*, the only authoritative case treating of these problems, departed entirely from the *Lemon* analysis. If legislators may collectively bow their heads while a clergyman, paid from public funds, invokes the Deity to bless and assist their efforts, it seems absurd to find fault with the designation of a room in which they may pray or meditate privately as they individually see fit.[3] Under the distinct analysis employed in *Marsh*, we conclude that H.R. 408 does not violate the establishment clause.

### B.

If, despite what we have said about *Marsh* and the special jurisprudence that applies to the internal practices of legislatures, we consider the present case in the light of *Lemon*, we think that H.R. 408 passes that test as well.

The *Lemon* test, as restated recently by the Court, poses three criteria. "First, the legislature must have adopted the law with a secular purpose. Second, the statute's principal or primary effect must be one that neither advances nor inhibits religion.

Third, the statute must not result in an excessive entanglement of government with religion." *Edwards v. Aguillard,* —— U.S. ——, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987) (citing *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111).

The Court has repeatedly stressed that the *Lemon* criteria are to be employed as a source of guidance—a "constitutional guidepost," *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)—rather than as a formula into which the courts can insert measured values and derive dispositive results. *See Meek v. Pittinger*, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975) (*Lemon* criteria do not set "precise limits to the necessary constitutional inquiry"); *Tilton v. Richardson*, 403 U.S. 672, 677–78, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971) ("There are always risks in treating criteria discussed by the Court from time to time as 'tests' in any limiting sense of that term."). Recently, in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), in which the Court rejected an establishment clause challenge to a creche placed on public property, the Court further clarified the purposes of the *Lemon* test by emphatically rejecting what it referred to as an "absolutist" approach. Elaborating on its critique of absolutism in this area the Court stated that "the Constitution [does not] require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.* at 673, 104 S.Ct. at 1359. The *Lynch* Court also quoted with approval from Justice Douglas' famous dictum " 'We are a religious people whose institutions presuppose a Supreme Being.' " *Id.* at 675, 104 S.Ct. at 1360 (quoting *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)). Providing a convenient place for individual legislators to engage in private

---

**3.** In discussing the effect of a pure moment of silence in the schools, one that was not tainted by clear evidence of legislative intent to advance religion, Justice O'Connor observed: "[i]t is difficult to discern a serious threat to religious liberty from a room of silent, thoughtful school children." *Wallace,* 472 U.S. at 73, 105 S.Ct. at 2499 (O'Connor, J., concurring); *see also Schempp*, 374 U.S. at 281, 83 S.Ct. at 1602–03 (Brennan, J., concurring). To us the image of a room of silent, thoughtful legislators seems at least equally innocuous.

prayer or meditation does not seem to offend the spirit of *Lynch v. Donnelly.*

Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith —as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so.

465 U.S. at 678, 104 S.Ct. at 1361–62. *Lynch,* in fact, illustrated official recognition of the value of prayer with the observation that "Congress has long provided chapels in the Capitol for religious worship and meditation." 465 U.S. at 677, 104 S.Ct. at 1361. This simple recitation of a practice of the U.S. Congress must tell us something about the problem raised by H.R. 408.

Turning to the specific *Lemon* criteria, we inquire first whether the resolution in question and the resulting prayer room have a secular purpose. A statute motivated partly by a religious purpose may still satisfy the interest prong of the *Lemon* test, but it "must be invalidated if it is entirely motivated by a purpose to advance religion." *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985) (citing *Schempp,* 374 U.S. at 296–303, 83 S.Ct. at 1610–14 (Brennan, J., concurring)); *Lynch,* 465 U.S. at 680–81, 104 S.Ct. at 1362. The Court has further held that the first *Lemon* criterion does not proscribe purposes in some way related to religion; rather it prohibits government "from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corporation of Presiding Bishops v. Amos,* — U.S. ——, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987).

The defendants argue that the Resolution's repeated references to "meditation" as well as prayer demonstrate the required secular purpose. "Meditation" may run the gamut from clearly religious phenomena to spiritual exercises having little "religious" content to quiet thought about how things are going.[4] Visitors to the prayer room may presumably set their own agendas as to "prayer or meditation." Legislators may, as they see fit, seek a vision of God or merely a hunch about the next day's calendar of bills. The Resolution itself suggests that they may legislate better for having taken some time to think quietly.[5] *See also Colo,* 378 Mass. at 559, 392 N.E.2d at 1200 (legislative prayer encourages reflection on "gravity and solemnity of [legislators'] responsibilities"). This is a secular purpose.

The Resolution does contain direct references to God and the desirability of seeking God's help in the legislative process. These religious references, if confined to the words of the Resolution, seem no different from other generally accepted and constitutionally permissible acknowledgments of the role of religion in American life. In *Lynch,* the Court listed a series of these acknowledgments, including congressional proclamations alluding to the religious significance of national holidays and presidential proclamations recognizing a "National Day of Prayer," as illustrations of appropriate governmental recognitions of religious faith. 465 U.S. at 676–78, 104 S.Ct. at 1360–62. Here we merely have like religious sentiments associated in a general way with an authorized prayer room about whose furnishings, physical configuration and specific uses we know very little. We do not think that a federal court should intrude itself into the internal spiritual affairs of a state legislature until there is some indication that general state-

---

**4.** A recent brief survey of silent prayer and meditation in various religious and philosophic traditions cites practices ranging from the use of silent meditation to gain self awareness, as recommended by Socrates, to silent worship practiced by Quakers. *See* C. Whittier, *Silent Prayer and Meditation in World Religions* (1983).

**5.** The Resolution's references to the spiritual bonds among legislators that exist "regardless of philosophical, political or religious differences" (H.R. 408 at para. 7) and to the contemplated "universality" of the room (*Id.* at para. 10) underscore the nonsectarian nature of the legislature's motivation.

ments of religious sentiments will give rise to concrete manifestations of unacceptable sectarian motives. *See Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (application of purposes prong of *Lemon* tempered by "reluctance to attribute unconstitutional motives to the states").

An argument can be made, based on *Wallace v. Jaffree,* that in assessing the constitutionality of the prayer room this court should accord considerable weight to the intent of the Illinois legislature as revealed in the language and history of the Resolution. In *Wallace,* the Court held that the Alabama legislature's "wholly religious" objective invalidated its moment of silence statute. But we think a room decorated and furnished with its own symbols and employed in its own way, speaks for itself far more clearly and authoritatively than does a moment of silence in the schools. The purpose and significance of a moment of silence is not conveyed by the practice itself. Legislative intent may therefore legitimately be consulted to define the moment of silence. *See Wallace,* 472 U.S. at 72–74, 105 S.Ct. at 2498–2500 (O'Connor, J., concurring in judgment) (moment of silence may endorse religion or not depending on whether legislature "has conveyed or attempted to convey the message that children should use the moment of silence for prayer"). A prayer room, on the other hand, will either contain religious symbols of various sorts or it will not. It will either be used in ways that implicate the first amendment or it will not. Thus, if it were used for group religious services, the implication might be quite different than if it were used for individual meditation. Similarly, if it were decorated with scenes from the New Testament, the implication might be different than if it contained representations of Daniel, Thomas More or Roger Williams as symbols of free exercise.

In addition, an inquiry into the finer points of legislative purpose or intent seems more apt when the ultimate issue is prayer or meditation to be undertaken by school children rather than by mature and spiritually self-reliant legislators. After all, school prayer as traditionally practiced has been disapproved by the Supreme Court. *Schempp,* 374 U.S. 203, 83 S.Ct. 1560; *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *see also Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (disallowing placement of plaque inscribed with ten commandments in classrooms). Legislative prayer, again as traditionally undertaken, has been approved. *Marsh,* 463 U.S. 783, 103 S.Ct. 3330; *Colo,* 378 Mass. 550, 392 N.E.2d 1195. The subtleties of legislative purpose therefore seem more significant for the former activity than for the latter.

Hence, although the legislative history of a prayer room may have some relevance, the actual physical realization of the room would seem much more relevant to its acceptability under the Constitution. The objective reality of the room should remove any ambiguity about intent that may exist in the legislative record.

Under the second *Lemon* criterion, we ask if the Resolution has the primary effect of advancing religion in general or some sect in particular. In a body that opens its daily sessions with public prayer, a subsequent opportunity for the legislators to pray or meditate individually seems at most a *de minimis* advancement of or benefit to religion. Access to a quiet place to take respite from the political fray can be hoped to advance the wisdom of the legislators. The Resolution, with its references to meditation as well as prayer, reflects this hope. Any advancement of religion in that context seems distinctly secondary, if not inconsequential. *See Bogen,* 598 F.2d at 1114; *Colo,* 378 Mass. at 559, 392 N.E.2d at 1200.

The final question under *Lemon* is whether the prayer room will engender administrative entanglements between religion and the state. The plaintiffs emphasize the responsibilities of the Legislative Space Needs Commission in furnishing and maintaining the room and in arranging financing from private or public sources. But considering that this is but a single room in the State Capitol, these logistical details seem not the stuff of a significant

state-church entanglement. *See Colo,* 378 Mass. at 559–60, 392 N.E.2d at 1200 (no impermissible entanglement where "[t]here is no evidence that the State has become embroiled in any difficult decisions about which religions are to be represented"); *see also Bogen,* 598 F.2d at 1113 (no impermissible entanglement posed by prayer preceding county board meetings). Indeed, we think that the unlikelihood of any significant entanglement resulting from a state legislature's ordering of its internal spiritual affairs is one reason why *Marsh* apparently created a special branch of establishment clause jurisprudence. *See supra* pages 1219–20. We are not talking here about dictating prayers or moments of silence to school children. We are merely allowing the legislature to set aside a room in which individual legislators may engage in private prayer or meditation as they choose, and presumably in the interests of a saner legislative process. Hence, even if the *Lemon* test applies to these legislative arrangements, we believe that its criteria are satisfied.

### C.

This leaves us with one further analytic concern. May the prayer room be justified as an accommodation of religion? That is, is the prayer room a necessary or desirable aid to individuals who wish to indulge their right to the free exercise of religion?

Plaintiffs argue that the prayer room cannot be considered a permissible accommodation of religion because it does not remove a government-imposed burden on free exercise. Plaintiffs also argue, relying on the analysis of the district court, that H.R. 408 cannot be protected by the accommodation doctrine because the Resolution, in the district court's words, "extends beyond mere facilitation of religious practice and ... favors one type of practice over another or all practices over none." 649 F.Supp. at 592. Defendants contend that the prayer room is a permissible accommodation because it facilitates individual religious exercise without endorsing any faith, or religion in general. In view of our discussion of H.R. 408's acceptability under

*Marsh* and *Lemon,* we need not undertake the daunting task of fully deciphering the Court's views on accommodation and on the relationship of this doctrine to the religion clauses of the first amendment. We believe, however, that the concept of accommodation lends support to the legislature's position in this case and we will briefly clarify the nature of this support.

The term "accommodation" has been given a number of different meanings in decisions and commentary discussing the limits that the establishment clause places on government assistance to religion. *See, e.g.,* McConnell, Accommodation of Religion, 1985 *Sup.Ct.Rev.* 1, 4 (cataloguing Court's various uses of term). Two distinct meanings of "accommodation" concern us here: (1) a measure that would violate the establishment clause if it were not compelled by the free exercise clause and (2) a measure that, while not compelled by free exercise, promotes free exercise values in ways that make it more acceptable under the establishment clause.

Justice Stevens uses the term in the first sense in *Wallace* when he states "there was no governmental practice impeding students from silently praying for one minute at the beginning of each schoolday; thus, there was no need to 'accommodate' or to exempt individuals from any general governmental requirement because of the dictates of our cases interpreting the Free Exercise Clause." 472 U.S. at 58 n. 45, 105 S.Ct. at 58 n. 45; *see also Katcoff v. Marsh,* 755 F.2d 223, 234–35 (2d Cir.1985) ("provision of churches and chaplains at military establishments [constitutes] ... an appropriate accommodation between the two clauses"). Justice O'Connor, on the other hand, employs the second meaning in developing her argument that the first amendment permits measures that promote the free exercise of religion if they do not send a reasonable observer a message of government endorsement. *Corporation of the Presiding Bishop v. Amos,* — U.S. ——, 107 S.Ct. 2862, 2874, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring in the judgment) (necessary "to separate those benefits to religion that constitutionally accommodate the free exercise of religion from

those that provide unjustifiable awards of assistance to religious organizations"); *see also Lynch,* 465 U.S. at 677–78, 681, 104 S.Ct. at 1361, 1363 (diverse public acknowledgements of religious belief represent permissible accommodations); *Marsh,* 463 U.S. 783, 812, 103 S.Ct. at 3346–47 (Brennan, J., dissenting) (possible that accommodation rationale would protect legislature's formation of voluntary prayer groups or even payment of clergy to serve individual members); *Gillette v. United States,* 401 U.S. 437, 453, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971) ("Quite apart from the question whether the Free Exercise Clause might require some sort of exemption, it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with 'our happy tradition' of 'avoiding unnecessary clashes with the dictates of conscience.' ").

The prayer room resolution probably represents an acceptable accommodation under the second, though perhaps not the first, of these meanings. Legislators, unlike, for example, overseas military personnel or prisoners, do not confront any significant government-imposed obstacle to their free exercise of religion. The legislators (and visitors to the statehouse) who would use the prayer room more closely resemble military personnel stationed in urban areas of this country. *See Katcoff,* 755 F.2d at 235–38 (upholding constitutionality of military chaplaincy program for most personnel but remanding to district court for consideration whether program is constitutionally permissible for certain stateside personnel). The free exercise clause does not *compel* the state to facilitate religious worship for legislators in downtown Springfield. Thus, if accommodation referred only to those exceptions to the general rules of nonestablishment that are *mandated* by free exercise, H.R. 408 would not qualify as an accommodation.

The second, more expansive meaning of accommodation, however, does apply in this case. The prayer room's proposed function promotes free exercise much more directly and effectively than the public recognition of religious tradition that the Court approved in *Lynch.* Following *Lynch,* one could argue that H.R. 408 "accommodates" religion in part by acknowledging the importance of religion in our culture and by marginally improving access to religion for members of the legislature. *Lynch* suggests that these would count as secular purposes under the first *Lemon* criterion. 465 U.S. at 673–80, 104 S.Ct. at 1359–63. Following *Amos,* one could argue that H.R. 408 accommodates religion by allowing individuals, and possibly even groups, to pursue their own religious practices. *Amos* suggests that this outcome satisfies the effects criterion of *Lemon.* 107 S.Ct. at 2868–69. *But see id.* at 2874 (O'Connor, J., concurring) (objecting to view that "establishment clause is not at all implicated as long as the government action can be characterized as 'allowing' religious organizations to advance religion, as opposed to government action directly advancing religion").

We believe that H.R. 408 survives the *Lemon* test (which applies only if we are incorrect in our view that *Marsh* controls this case), without relying on accommodation as a secular purpose or effect. We are therefore content at the moment to skirt the edges of the accommodation thicket. If future developments in this case require us to enter, we will perhaps have the benefit of intervening efforts by the Supreme Court to clear away some of the underbrush.

## V.

For the reasons discussed above, we conclude that H.R. 408 does not violate the establishment clause. We reiterate, however, that our conclusion should in no way suggest that further developments in the decoration and use of the prayer room will automatically or routinely pass constitutional muster. The intrusion of sectarian influences and religious emphases could give rise to an establishment clause violation where none presently exists.

The judgment of the district court is REVERSED.

## APPENDIX

### TEXT OF H.R. 408

WHEREAS, Abraham Lincoln immortalized the phrase "this nation under God" in the Gettysburg Address, and in the Pledge of Allegiance to the Flag, which is recited at the opening of each Session of the General Assembly, we utter "one nation under God"; and

WHEREAS, Prayer was offered at the great Convention which framed our National Constitution, and our currency and many of our postage stamps witness our faith in Divine Providence, and a long list of National and Illinois leaders down through the years have borne witness to their personal trust in God; and

WHEREAS, Near the Rotunda of the United States Capitol there it [sic] a room set apart for prayer and meditation to be used primarily by members of Congress who wish to withdraw and seek Divine strength and guidance, both in public affairs and in their own personal concerns; and

WHEREAS, The prayer room was established pursuant to House Concurrent Resolution 60, in 1953, and Senate Concurrent Resolution 14, in 1954 during the Eighty–Third Congress of the United States; and

WHEREAS, The Honorable Joseph W. Martin, Jr., Speaker of the United States House of Representatives, made available an appropriate room on the House side of the Capitol which was completed and opened for use in March of 1955; and

WHEREAS, More than 20 years ago members of the Illinois General Assembly initiated efforts to establish a place within the Illinois State Capitol Building for prayer and meditation, but their efforts were temporarily thwarted; and

WHEREAS, The strong desire remained alive within the hearts of many members of the Illinois General Assembly, and those members have maintained and established a spiritual bond among themselves, regardless of philosophical, political or religious differences; and

WHEREAS, Many of the same individuals currently meet together for Bible study and prayer breakfast to improve the relationships among members of the General Assembly, and some as recently as 2 years ago sought general approval from the Legislative Space Needs Commission; and received general approval from the leaders of the General Assembly, creating a fire of enthusiasm that died down slightly, only to be rekindled in the past several months; and

WHEREAS, The Preamble to the Constitution of the State of Illinois reads "We the People of the State of Illinois—grateful to the Almighty God for the civil, political and religious liberty which He has permitted us to enjoy and seeking His blessing upon our endeavors," sets the stage for such a room; and

WHEREAS, The establishment of such a room, because of its universality, is within the provisions of Section 3 of Article X of the Illinois State Constitution, where the use of public funds for sectarian purposes is forbidden in that no State funds shall be allocated for "anything in aid of any church or sectarian purpose"; and

WHEREAS, The concept is consistent with the provisions of subsection (a) of Section 1 of Article VIII of the Illinois State Constitution, which provides that "public funds or credit shall be used only for public purpose" in that the facility will be made available to the People of the State of Illinois, represented in the General Assembly, and it is the intent that private donations shall ultimately finance the cost of any renovation necessary to establish a proper and suitable room; and

WHEREAS, The Illinois House and Senate as well as the United States House and Senate open all their Sessions with prayer through the Ministry of Chaplains, and such Chaplains pray to God for the men in our armed services for daily strength, will and life; and

WHEREAS, It is in this great tradition that the General Assembly should have, primarily for its members in the State Capitol Building, a quiet and special place, where its members may seek God, the com-

fort of His presence, the light of His guidance, and the strength of His love; therefore be it

RESOLVED, BY THE HOUSE OF REPRESENTATIVES OF THE EIGHTY–FOURTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, that the Legislative Space Needs Commission is hereby authorized and directed to make available a room with facilities for prayer and meditation, primarily for the use of the members of the General Assembly, and the Commission shall arrange for the maintenance of the prayer room; and be it further

RESOLVED, The Speaker of the House in conjunction with the House Minority Leader, shall appoint a special committee to arrange for the design and equipment of the prayer room and for the raising of private donations to fund the operation and maintenance of the prayer room; and be it further

RESOLVED, That a suitable copy of this Resolution be presented to the Executive Director of the Legislative Space Needs Commission.